1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -x
                              :
STEVEN R. PERLES,             :
                              :
        Plaintiff,            :
                              : Case No.
     v.                       : CA 01-0105
                              :
ANNE MARIE KAGY,              :
                              :
        Defendant.            :
                              :
- - - - - - - - - - - - - - -x

Washington, D.C.
January 21, 2003
10:10 a.m.

Transcript of Trial by Court
Before the Honorable Thomas P. Jackson
United States District Judge

APPEARANCES:

For the Plaintiff:      STEVEN SCHNEEBAUM, ESQ.
                        DEBRA M. LABOSCHIN, ESQ.

For the Defendant:      DAVID SHER, ESQ.
                        MARK D. CUMMINGS, ESQ.
                        MARY MERTZ PARNELL, ESQ.

Court Reporter:         DAVID A. KASDAN, RDR-CRR
                        Miller Reporting Co., Inc.
                        735 8th Street, S.E.
                        Washington, D.C.  20003
                        (202) 546-6666

EXHIBIT 2

INDEX

|  | PAGE |
|---|---|
| OPENING STATEMENT | |
|   By Mr. Schneebaum | 3 |
|   By Mr. Cummings | 26 |

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| THOMAS FORTUNE FAY | 42 | 82 | 106 | 114 |
| STEPHEN FLATOW | 117 | 128 | 130 | |
| STEVEN PERLES | 131 | | | |

EXHIBITS

| NUMBER | MARKED | ADMITTED |
|---|---|---|
| Kagy Exhibit F | | 117 |
| Kagy Exhibit D | | 166 |

1    A.    This is lunch one?

2    Q.    Lunch two.

3    A.    Lunch two, okay.

4    Q.    At the time of that lunch, didn't you say to Anne Marie Kagy that you would like to see that she got something substantial and that you would have been willing to contribute, even though you had no obligation to pay her anything, up to a half a million dollars?

9    A.    I did say I wanted her to get something substantial, and I certainly did say I was willing to contribute something up to that.  I had no obligation to, but I was willing to do that.

        Let me explain one thing on that.

14   Q.    But I would prefer if you let me just ask the questions.  You may answer on your own time, as you can appreciate.

        When you offered to do that, you said to her, I will go see--I would be willing to speak to Steve for you; isn't that correct?

20   A.    Certainly, yes, I did.

21   Q.    And now, this is in the year 2000, isn't it?

22   A.    Yes.

23   Q.    Okay.  And at that point, she had told you that she had presented agreement for one-third and sometime close that.

95

1  Foreign Sovereign Immunities Act, I think it's fair to
2  say that the one thing we did not anticipate was that
3  any American executive, any administration would enter
4  an appearance on behalf of a terrorist nation against an
5  American citizen holding the judgment. So, we did not
6  anticipate that we would have the problems we had, the
7  type of problems we had in collection.
8      Q. Well, when you testified earlier, you said that
9  you were chiefly responsible for the collection effort.
10     A. That's correct.
11     Q. Okay. That's a correct statement?
12     A. Yes.
13     Q. Now--
14     A. That developed rather to be a subject of
15 agreement at the time that Steve and I and Anne Marie
16 was there too, met at this what you termed this lunch
17 one, I agreed to come on the case.
18     Q. As between the collection effort as between the
19 three of you, you put in the most effort, would you say?
20     A. Yes.
21     Q. Okay. Didn't get paid anything extra for that,
22 did you?
23     A. No.
24         But the agreement between Steve and I (sic) was
25 that we would split the net amount of the fee at the

1  end. The only way that was ever varied was that when
2  the money came in, we agreed that the people that we
3  owed money to that worked on the case would all be paid
4  without trying to go through a lot of scrambling
5  arithmetic on who paid this expert or who paid that
6  expert or whatever.
7        So, everybody that was unpaid then, which went
8  from the forensic pathologist to Mr. Holme, everyone who
9  was paid got paid off the top, so to speak, before we
10 got to the net amount that was split.
11     Q.  How much did you pay Mr. Holme?
12     A.  For this case, I believe it was $200,000, but
13 Mr. Holme had worked with me for years, so I paid him
14 additional amounts that really were reflection of all
15 the things he had done for me over the years.
16     Q.  This is the videographer?
17     A.  Yes, he was more--
18     Q.  How much total did he get out of this?
19        THE COURT:  Who was this?
20        THE WITNESS:  He did the video, but he did more
21 than that. Vic was--
22        BY MR. SHER:
23     Q.  What I want to know from you, and the question
24 is--and I would appreciate it if you would answer it--is
25 how much did you pay him total out of the whole thing?

1   A.   Out of the whole thing?

2   Q.   Um-hmm.

3   A.   Out of my share, it was a little bit over $2
4   million out of my share.

5   Q.   That's what you paid Mr. Holme?

6   A.   That's what I paid Mr. Holme.

7        Out of my share, not for the work on this.  The
8   work on this he was paid $200,000 by Steve and I (sic)
9   together.

10  Q.   So, you paid the 200,000, and then you, as an
11  act of generosity, paid on your own accord 2 million?

12  A.   You could call it generosity, but the fact is,
13  in things like this, over years, you build up
14  relationships with people.  The things that Mr. Holm did
15  in this case I would have trouble paying anyone that
16  amount.

17       For instance, when we took depositions down in
18  the Gaza Strip, the place where we went to take the
19  depositions was shot up by Palestinian Islamic Jihad or
20  Hamas the day before.  I don't know how you bargain out
21  with the videographer going some place and say, Oh, by
22  the way, they're getting small arms fire in there.
23  That, to me, and things like that over the years,
24  Mr. Holm did an awful lot of work for me over the years
25  and never even sent a bill on.

1  the thing finished and file it.

2  Q. Now, at that point when you did that, you were
3  aware that she had some difficulties with Mr. Perles in
4  terms of getting her agreement in writing, or an
5  agreement in writing?

6  A. No less than I said before. She had given
7  Steve something in writing, and Steve said, I didn't
8  agree to this, and there was no further conversation.

9  Q. No further conversation ever about it as far as
10 you know?

11 A. As far as I know. I never asked Steve about
12 it. I never asked Anne Marie about it further.

13 Q. The $500,000 amount that you talked about in
14 terms of contributing, that was just something that you
15 were--would have been willing as a contribution. It
16 wasn't like her entire fee, was it, from your
17 perspective?

18 A. Well, I felt that it would be fair for me to
19 throw something in because Steve had insisted on paying
20 half of the amount we were paying Vic Holm, who would
21 primarily work for me. So, it seemed to me that
22 would--that would be fair. I had no legal obligation.
23 I could have--

24 Q. But you would have expected Steve to add
25 something to that, I take it. You weren't trying to