# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Thomas Fortune Fay,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:05CV01209 (PLF) |
| ) | |
| **Steven R. Perles,** ) | |
| ) | |
| and ) | |
| ) | |
| **Greenberg Traurig LLP** ) | |
| ) | |
| Defendants. ) | |
| ) | |

PLAINTIFF'S STATEMENT OF DISPUTED GENUINE ISSUES
OF MATERIAL FACTS NECESSARY TO BE LITIGATED

Plaintiff, by counsel and pursuant to LCvR 7 (h) and LCvR 56.1, states:

Statements of defendant Perles, taken from Section I (Statement of Undisputed Facts)(hereafter, "SUF") of his submission entitled "Memorandum of Law in Support of Defendant Perles' Motion for Summary Judgment as to Plaintiff's Claims or, in the Alternative, To Dismiss the Complaint" (hereafter, "Perles Memorandum"), will appear herein ***in bolded italics.*** Plaintiff 's response disputing each selected statement will follow seriatim in ordinary type.

1. Pages 1, 2: ***In 1996, Mr. Perles was successful in persuading Congress to pass new legislation under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605, to allow the victims of terrorist attacks to file suits in federal courts in the United States against foreign***

1

*governments that sponsor and/or provide any form of assistance to facilitate acts of terrorism against American citizens abroad.*

Response:

(a) This statement does not include "references to the part of the record relied on to support the statement", as required by LCvR 7 (h) and LCvR 56.1, and cannot, therefore, be considered as a premise of or support for the Perles motions.

(b) This statement is untrue. The jurisdictional statute allowing victims of terrorism to sue in federal courts, 28 U.S.C. § 1605 (a) (7) became law on April 24, 1996. Mr. Perles had nothing to do with the drafting or passage of this statute. The Flatow Amendment, 28 U.S.C. § 1605 note[1] became law on September 30, 1996, for which Mr. Fay had drafted sections dealing with damages, which substantially enlarged the scope of possible awards. The final draft of the Flatow Amendment was achieved in collaboration with representatives of the U. S. State Department. Messrs. Fay and Perles, as well as counsel for a number of other victims, participated in the presentation of the Flatow Amendment to Congress, but it was largely the unrelenting lobbying efforts of Stephen M. Flatow that persuaded certain Members of the House and Senate to shepherd the bill through Congress to passage.

Record reference: Declaration of Thomas Fortune Fay.

2. Page 2: *In that regard, the Perles and Fay law practices entered into a partnership agreement . . .*

This statement is untrue, in that it implies that the partnership agreement was between

---

[1] Recognized as the "Flatow Amendment to the FSIA." See, *Acree v. Republic of Iraq,* 370 F.3d 41 (D.C. Cir 2004); *Cicippio-Puleo v. Islamic Republic of Iran,* 353 F.3d 1024 (D.C. Cir. 2004)

2

two organizations ("practices") and not two individuals (Fay and Perles), in an evident attempt to support  misrepresentations appearing in Section IV. B. (Legal Argument: Fay not real party in interest), which appears on pages 13 – 15, of the Perles Memorandum.  The partnership agreement was oral, and was not memorialized in writing until February 26, 2001, after Mr. Perles had sued his former employee, Anne Marie Kagy, for a declaratory judgment (January 19, 2001) and Ms. Kagy had counterclaimed against Mr. Perles's law firm and filed a third-party complaint against Mr. Perles (both on February 12, 2001) for legal fees associated with the *Flatow, Eisenfeld and Duker* cases referred to on pages 3 and 4 of the SUF.

Record references: Fay Declaration; Partnership Agreement , 02/26/01 (Exhibit B to Perles Memorandum); *Perles v. Kagy,* Case No. 1:01cv00105 (AK), Docket  #1, #3, #4 (attached as Exhibit A to Fay Declaration)

3. Page 2:  ***The partnership leased space at 501 G Street, N.W., Washington, D.C. 20001, where it established its central business location.  n. 3 Although Mr. Perles' name remains on the lease for that office space, Mr. Fay, by fiat, has taken over the space for his law practice and pays all of its rent.***

(a) This statement does not include "references to the part of the record relied on to support the statement", as required by LCvR 7 (h) and LCvR 56.1, and cannot, therefore, be considered as a premise of or support for the Perles motions.

(b) This statement is untrue.  Mr. Fay and Mr. Perles rented the 2nd floor of 700 5th Street, Washington, for a one-year term, beginning on April1, 2001, after the judgments in the Flatow, *Eisenfeld and Duker* cases were collected and disbursed, the $2 million transaction at issue in the instant case had occurred, and Mr. Perles and Ms. Kagy became engaged in the lawsuit against

each other. Mr. Perles's name does not "remain on the lease for that office space" because he refused to renew the lease in 2002, when Mr. Fay and two others signed a two-year lease on the space, and have renewed the lease regularly since then.

Record references: Fay Declaration; front sheet of lease on 700 5th St. (attached as Exhibit B to Fay Declaration)

4. Pages 2, 3: *Mr. Perles' primary area of expertise involved developing creative ways to bring and maintain lawsuits against foreign governments that aided and abetted terrorist attacks against Americans abroad. Mr. Fay, on the other hand , focused on the development of facts necessary to bring these cases to trial.*

(a) This statement does not include "references to the part of the record relied on to support the statement", as required by LCvR 7 (h) and LCvR 56.1, and cannot, therefore, be considered as a premise of or support for the Perles motions.

(b) This statement is untrue. After the 1996 legislation, 28 U.S.C. 1605 (a) (7) and the Flatow Amendment, had been enacted and signed into law, there was no need to develop "creative ways to bring and maintain lawsuits against foreign governments . . ." The *Flatow* case was prepared, filed and tried to judgment in, as were the *Eisenfeld* and *Duker* cases, and others that followed. This work was collaborative: Mr. Perles was mainly responsible for briefing legal issues and Mr. Fay did the rest of the trial preparation, including the assembly and videotaping of witnesses in the United States and Israel and all aspects of the trial itself.

Record references: Fay Declaration, ¶ 4.

5. Page 3: *. . . Mr. Perles persuaded Congress to pass additional legislation . . .*

(a) This statement does not include "references to the part of the record relied on to

support the statement", as required by LCvR 7 (h) and LCvR 56.1, and cannot, therefore, be considered as a premise of or support for the Perles motions. Exhibit C to the Perles Memorandum makes reference neither to Congress passing additional legislation nor to what role, if any, Mr. Perles may have played in its enactment.

    (b) This statement is untrue. Mr. Fay drafted the additional legislation necessary to achieve release of frozen Iranian assets after Mr. Fay had located and issued attachments of Iranian property in the United States, which the State and Treasury Departments opposed. Again, it was through the collaborative efforts of Mr. Flatow and his counsel, Messrs. Fay and Perles, and counsel for a number of other terrorism victims, that new legislation was passed that required the Treasury Department to release enough Iranian assets to satisfy payment of the compensatory damage components of the judgments. The application form (Exhibit C to the Perles Memorandum) was neither required nor authorized by the new legislation, but was simply a final administrative step Treasury insisted be taken. It was Mr. Perles who filled out and submitted the form. Mr Fay disputes this statement.

    Record references: Fay Declaration; Exhibit C to the Perles Memorandum.

    6. Page 4: **B. *The Kagy Litigation.***

    (a) Apart from record references to fragments (four pages) of the transcript of a session of the *Perles/Kagy* trial on January 21, 2003 (Exhibit D to the Perles Memorandum) that support the first three sentences of sub-section B of the SUF, the remainder of this statement does not include "references to the part of the record relied on to support the statement", as required by LCvR 7 (h) and LCvR 56.1, and cannot, therefore, be considered as a premise of or support for the Perles motions.

(b) The entirety of Mr. Perles's theory in the *Kagy* case, including all of the allegations stated in sub-section B of the Perles Memorandum and the testimony of Mr. Perles in the *Kagy* trial recorded in the transcript fragments cited above, was rejected by the district court in its Decision and Order dated April 10, 2003, and cannot, therefore, operate as record support that these statements (sub-section B of the Perles Memorandum) are undisputed facts.

Record reference: *Perles v. Kagy,* Civ. No. 01-105 (D.D.C., April 10, 2003) (Docket # 60).

7. Pages 4 and 5. ***At around the same time, Mr. Schneebaum met with Messrs. Perles and Fay to discuss trial strategy and the direction of the lawsuit. It was Mr. Schneebaum's understanding that Mr. Fay was going to be "extensively involved" in the lawsuit as the case progressed because Ms. Kagy attempted to assert an equitable lien on a share of the proceeds received by the partnership from the two cases. (See Schneebaum Aff. at ¶¶ 4-5, attached hereto as Exhibit E).***

This statement is untrue. Mr. Fay did not discuss "trial strategy and the direction of the lawsuit" with Mr. Schneebaum and Mr. Perles. Mr. Fay has never said that "he was going to be 'extensively involved' in the lawsuit as the case progressed", nor was he "extensively involved" in the lawsuit, nor has he ever said to Mr. Perles or Mr. Schneebaum anything that could have produced an "understanding" that he would do so, nor did he become involved at all in the lawsuit except to testify at deposition and in trial in response to subpoenas issued by Ms. Kagy's lawyer. Contrary statements in Mr. Schneebaum's affidavit, ¶¶ 4-5 (Exhibit E to the Perles Memorandum) are either false or incorrectly remembered, and are disputed by Mr. Fay.

Record reference: Fay Declaration

6

8. Page 5: ***Due to this concern, Messrs. Perles and Fay both discussed with Mr. Schneebaum how much money each of them should deposit in Patton Boggs, LLP's escrow account to cover legal fees and/or pay any judgment or settlement in connection with the Kagy litigation.***

This statement and its corresponding allegations in ¶ 6 of the Schneebaum affidavit (Exhibit E to the Perles Memorandum) are either false or incorrectly remembered, and are disputed by Mr. Fay.  Mr. Fay never discussed with Mr. Perles or Mr. Schneebaum that money being escrowed in the Patton Boggs LLP account was to cover or otherwise be used to pay legal fees , a judgment or a settlement associated with the *Perles/Kagy* lawsuit.  At the time the money was deposited in Mr. Schneebaum's law firm trust account, there was no lawsuit filed or pending.  All that Mr. Fay was informed by Mr. Perles was that Ms. Kagy had asserted a lien on the total proceeds fro the cases and that she wanted $2,000,000.  Mr. Fay replied to Mr. Perles that this amount would have to be held back in escrow, notwithstanding the dubious validity of an attorney's lien in the absence of an agreement.

Record reference:   Fay Declaration.

9. Page 5. ***As the Account Activity Report reveals, Messrs. Perles and Fay set aside $2,000,000.00 from the fees that they collected in the Flatow and Eisenfeld and Duker cases for two purposes: to cover Patton Boggs, LLP's legal fees and/or pay any potential judgment or settlement in connection with the Kagy litigation. (See Wachovia Bank Activity Report, attached hereto as Exhibit G).***

This statement and its corresponding allegations in ¶ 6 of the Schneebaum affidavit (Exhibit E to the Perles Memorandum) are either false or incorrectly remembered, and are

disputed by Mr. Fay. The reference to Exhibit G is disputed because the Account Activity Report "reveals" no such thing. What it does reveal is that the bank account from which the $2 million was wired to Mr. Schneebaum's account was a "business economy checking account" owned by two individuals, "Stevn (sic) R. Perles & Thomas Fortune Fay" and *not* "an account at Wachovia Bank held jointly in the names of the Perles and Fay practices" as Mr. Schneebaum asserted in ¶ 5 of his affidavit (Exhibit E to the Perles Memorandum). Mr. Fay did not "set aside" or in any other way commit or imply that he was willing to spend any of the escrowed money on anything, and certainly not "in the pursuit of the objectives" of paying legal fees, litigation expenses, judgements or settlements. The $2 million was escrowed before the lawsuit was filed and nearly a month before Ms. Kagy filed her counterclaim and third-party complaint against Mr. Perles and his law firm.

    Record references:   Fay Declaration; Exhibits E and G to the Perles Memorandum; *Perles v. Kagy,* Case No. 1:01cv00105 (AK), Docket Entries #1, #3, #4 (attached as Exhibit A to Fay Declaration)

    10.  Page 5. ***It was Mr. Schneebaum's understanding that Messrs. Perles and Fay had wired the funds to Patton Boggs, LLP's escrow account in pursuit of those objectives. (Schneebaum Aff. at ¶ 6).***

    This statement and its corresponding allegations in ¶ 6 of the Schneebaum affidavit (Exhibit E to the Perles Memorandum) are either false or incorrectly remembered, and are disputed by Mr. Fay. Mr. Fay never said or implied that the funds had been wired "in pursuit of those objectives", nor has he ever said to Mr. Perles or Mr. Schneebaum anything that could have produced such an "understanding." As set forth above, the $2 million was transferred only in

response to the assertion of an attorney's lien by Ms. Kagy.

Record reference:  Fay Declaration.

11.  Page 6.  ***During the course of the Kagy litigation, Mr. Fay was an active participant virtually every step of the way.***

This statement is untrue, and is disputed by Mr. Fay.  Mr. Fay never participated, actively or passively, or became involved in the lawsuit except to testify at deposition and in trial in response to subpoenas issued by Ms. Kagy's lawyer, in preparation for which he was interviewed separately by Mr. Schneebaum and Ms. Kagy's attorney, at the separate requests of each, and stated the facts as he knew them and as they are set forth herein.  Statements in Mr. Schneebaum's affidavit (Exhibit E to the Perles Memorandum) to the contrary are either false or incorrectly remembered, and are disputed by Mr. Fay.

Record reference:  Fay Declaration; Schneebaum Affidavit, ¶¶ 4,7 (Exhibit E to Perles Memorandum).

12.  Page 6.  ***Mr. Fay had many discussions with Mr. Schneebaum concerning litigation strategy and trial tactics . . .***

This statement is untrue.  Mr. Fay did not discuss litigation strategy and trial tactics with Mr. Schneebaum.  Statements in Mr. Schneebaum's affidavit (Exhibit E to the Perles Memorandum) to the contrary are either false or incorrectly remembered, and are disputed by Mr. Fay.

Record reference:  Fay Declaration; Schneebaum Affidavit, ¶¶ 4,7 (Exhibit E to Perles Memorandum).

13.  Page 6.  ***At trial, Mr. Fay testified that he wanted to contribute $500,000.00***

*towards Ms. Kagy's fee demand because both partners had agreed to bear an equal share in the fees owed to experts, investigators, and attorneys who provided professional services in connection with their terrorism cases.(Tr. Trans. at pp 96, 104).*

This statement is untrue.  Mr. Fay did not so testify, and the transcript fragments ( pp. 96, 104, Exhibit D to Perles Memorandum) cited do not support the statement, which Mr. Fay disputes.

Record reference:  Fay Declaration; Exhibit D to Perles Memorandum, pp 96, 104.

14. Page 6.  ***Consistent with this agreement, Mr Fay agreed to bear his co-equal share of the legal fees incurred in connection with the Kagy litigation and wired his co-equal share of $1,000,000.00 to Patton Boggs, LLP's escrow account.***

(a) This statement does not include "references to the part of the record relied on to support the statement", as required by LCvR 7 (h) and LCvR 56.1, and cannot, therefore, be considered as a premise of or support for the Perles motions.

(b) This statement is untrue.  Mr. Fay never agreed to anything of the sort.  Neither Mr. Fay nor the Fay/Perles partnership was sued by Ms. Kagy, and thus neither had any obligation or responsibility, legal or otherwise, to pay Mr. Perles's bills, including a "co-equal share of the legal fees incurred in connection with the *Kagy* litigation."  Mr. Fay never agreed to share Mr. Perles's legal fees, and he disputes this statement.

Record reference:  Fay Declaration.

15. Pages 9, 15-16.  **2. <u>Lack of Diversity Jurisdiction.</u>**

Implied but not stated in this argument as an undisputed fact is Mr. Perles's contention

that Mr. Fay is not, as alleged in ¶ 1 of the Complaint, a resident of Maryland. Mr. Fay has resided continuously and been domiciled in Maryland for the past 35 years, since 1970. He is admitted to the Bars of and practices law in Maryland and the District of Columbia.

Record reference: Fay Declaration; Complaint, ¶ 1.

_/s/_____
John W. Karr   57430
Karr & Allison, P.C.
1920 N Street, NW   Suite 300
Washington, DC 20036
(202) 331-7600
Attorneys for plaintiff
