1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - -x
STEVEN R. PERLES,              :
                               :
        Plaintiff,             :
                               : Case No.
    v.                         : CA 01-0105
                               :
ANNE MARIE KAGY,               :
                               :
        Defendant.             :
                               :
- - - - - - - - - - - - - -x

Washington, D.C.
January 21, 2003
10:10 a.m.

Transcript of Trial by Court
Before the Honorable Thomas P. Jackson
United States District Judge

APPEARANCES:

For the Plaintiff:       STEVEN SCHNEEBAUM, ESQ.
                         DEBRA M. LABOSCHIN, ESQ.

For the Defendant:       DAVID SHER, ESQ.
                         MARK D. CUMMINGS, ESQ.
                         MARY MERTZ PARNELL, ESQ.

Court Reporter:          DAVID A. KASDAN, RDR-CRR
                         Miller Reporting Co., Inc.
                         735 8th Street, S.E.
                         Washington, D.C.  20003
                         (202) 546-6666

EXHIBIT B

2

INDEX

|  | PAGE |
|---|---|
| OPENING STATEMENT | |
| By Mr. Schneebaum | 3 |
| By Mr. Cummings | 26 |

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| THOMAS FORTUNE FAY | 42 | 82 | 106 | 114 |
| STEPHEN FLATOW | 117 | 128 | 130 | |
| STEVEN PERLES | 131 | | | |

EXHIBITS

| NUMBER | MARKED | ADMITTED |
|---|---|---|
| Kagy Exhibit F | | 117 |
| Kagy Exhibit D | | 166 |

1    A.    I believe so, yes.

2    Q.    Did you pay everyone more than he or she asked?

3    A.    I believe we did, yes.

4    Q.    By what kind of factor?

5    A.    Oh, gosh, there were a couple of people that
6  essentially said to either Steve or myself, Well, pay
7  whatever you think is fair, and we paid them quite a
8  bit.  I mean, three or four times they asked for
9  something specific three or four times that they asked
10 for.

11   Q.    Now, what about Anne Marie?  What was your
12 understanding of the way Anne Marie was to be paid?

13   A.    When this legislation went through, Steve and I
14 talked about Anne Marie, and Steve said that Anne Marie
15 wouldn't talk to him.

16         Within a short time thereafter, I got a call
17 from Anne Marie, and she--I invited her to come over to
18 lunch with me, over at the Capitol Grill--that's a theme
19 you will find repeatedly here--and I asked Anne Marie
20 essentially what the situation was and what could be
21 paid in order to compensate her for what she had put in.
22 I never really got--I never got any figure from her at
23 all.  The only reply to that was later on when we got
24 into January--that was late October or November--I can't
25 remember which, but there within that time period, we

```
 1   got into January, and Anne Marie called me back, and I
 2   went out to lunch with again with her and Mr. Sher.
 3       Q.   Her lawyer?
 4       A.   Her lawyer, yes.
 5       Q.   Do you know whether Steve ever contacted--Steve
 6   Perles, that is--ever contacted Ms. Kagy to attempt to
 7   discuss how much she might be paid?
 8       A.   I know from Steve that he attempted to contact
 9   her, and she would not talk to him.
10       Q.   Did you have a conversation with Mr. Perles
11   concerning how much you thought Ms. Kagy should be paid?
12       A.   Yes.  Steve and I had a conversation with
13   regard to, first of all, what's a fair amount.  And I
14   remember bringing up a figure of some place between
15   75,000 and 125,000, that being the range for a year's
16   work from--for people who were new hires in law firms or
17   from top-level law schools and Law Review and that type
18   of thing.
19           So, that was the only conversation we had with
20   regard to figures as to what I thought and I think Steve
21   agreed with that, felt would be a reasonable amount of
22   money.
23       Q.   Between 75,000 and 125,000?
24       A.   Yes.
25       Q.   Did Mr. Perles talk to you or did you talk to
```

```
 1  him about a multiple that might be applied just as you
 2  did with other people?
 3      A.  Oh, sure.  We didn't talk about a number, but
 4  we were not--we were not trying to chisel the people
 5  that had worked on this case.  It's the opposite.  I
 6  mean, we paid everyone who gave us a figure more than
 7  what they asked for.
 8      Q.  Now, you testified a moment ago that 75 to 125
 9  was your understanding of what associates in top flight
10  law firms were making in those days.
11          Did you do any kind of survey or anything
12  scientific to ascertain that?  Or was it just something
13  you knew?
14      A.  No--well, I didn't do anything specifically
15  with regard to this case.  However, I had other cases at
16  the same time, and one of them involved a grid, you
17  might say, that--I think that's the way they termed it.
18  It was put out by the United States Attorney's Office
19  for the District of Columbia for payment of attorney's
20  fees that had been ordered in civil rights cases.  And
21  they had a schedule that they considered to be
22  reasonable, depending upon years of practice and so
23  forth.  And I was aware of this just because I had done
24  research on another case, and I considered that as well.
25          In addition to which, I had read various things
```

1   about the starting salaries--

2          MR. SHER:  Your Honor, could I interpose an

3   objection on these?  He's going on in a field that I

4   don't think is appropriate for him to be testifying.

5   It's certainly not factual about this case.  I would ask

6   the witness be confined to either what he knows that's

7   factual to this case.  Or if he's going to be otherwise

8   qualified as an expert or something like that, it's a

9   different story.

10         MR. SCHNEEBAUM:  I don't mind restraining him,

11  Your Honor, to what he did, what he actually ascertained

12  himself.  He was explaining why he had the conclusion

13  that he had.

14         THE COURT:  All right.  Objection is overruled.

15         BY MR. SCHNEEBAUM:

16  Q.   Mr. Fay, then based on--

17         THE COURT:  Incidentally, would you pick an

18  appropriate time for us to take our noontime recess.

19         MR. SCHNEEBAUM:  I think about two more minutes

20  for this witness.

21         And I notice, I didn't want to be guilty of

22  what Mr. Fay was accused of, so I checked the pre-trial

23  order.  I said he would be under an hour.  He started at

24  11:35, so I'm going to be true to my word by about one

25  minute, It think.

```
 1          THE COURT:  All right, Mr. Schneebaum.
 2          THE WITNESS:  I'm glad to be a partner and
 3   making it legal.
 4          BY MR. SCHNEEBAUM:
 5     Q.   Mr. Fay, was it the conclusion of the
 6   discussion you had with Mr. Perles that in the joint
 7   view of the two of you, the value of the services that
 8   you provided in this case was between 75,000 and
 9   $125,000?
10     A.   Yes.
11     Q.   And it was your understanding that Mr. Perles
12   was prepared to offer her some multiple of that?
13     A.   Well, we were prepared to pay everyone who
14   worked that, yes, on a multiple.
15     Q.   Do you have an idea of what multiple you had in
16   your mind?
17     A.   I was probably thinking of two or three times,
18   but I don't remember ever giving a number to Steve nor
19   Steve giving one to me.
20     Q.   Did you discuss with Mr. Perles the possibility
21   of making Ms. Kagy an offer of ongoing employment?
22     A.   Yes, we did, with the thought being, frankly,
23   that if Anne Marie were to get a considerable sum of
24   money out this, it would be better for her if that were
25   spread out over several years, and we entered into some
```

```
 1   type of a contract where we would pay her equal amounts
 2   for five straight years or four--I can't remember what
 3   term we were talking about.  It seems we were anywhere
 4   from three to five years, and that would be better for
 5   her, and she might be interested in doing that.
 6       Q.   Did that ever happen?
 7       A.   No, it didn't.  And frankly, it seemed to me at
 8   some point that this thing had become heated enough so
 9   that really would not be advisable, and that--I said
10   that to Steve.  I sort of, in the vernacular, put the
11   kibosh on that proposition, not Steve.
12       Q.   When you say this thing got too heated, what
13   did you mean?
14       A.   I believe that shortly after that the
15   litigation began.  There was a demand letter from Anne
16   Marie's attorney, and I just--I didn't feel it would be
17   appropriate for us to enter into some kind of a
18   contractual arrangement with Anne Marie in the face of
19   all of this, that demand letter and the litigation and
20   so forth.
21       Q.   Thank you, Mr. Fay.
22            MR. SCHNEEBAUM:  Your Honor, I have no more
23   questions.
24            THE COURT:  All right.  We will take our
25   noontime recess and reconvene at 2:00.
```

1  Foreign Sovereign Immunities Act, I think it's fair to
2  say that the one thing we did not anticipate was that
3  any American executive, any administration would enter
4  an appearance on behalf of a terrorist nation against an
5  American citizen holding the judgment. So, we did not
6  anticipate that we would have the problems we had, the
7  type of problems we had in collection.
8      Q.   Well, when you testified earlier, you said that
9  you were chiefly responsible for the collection effort.
10     A.   That's correct.
11     Q.   Okay. That's a correct statement?
12     A.   Yes.
13     Q.   Now--
14     A.   That developed rather to be a subject of
15  agreement at the time that Steve and I and Anne Marie
16  was there too, met at this what you termed this lunch
17  one, I agreed to come on the case.
18     Q.   As between the collection effort as between the
19  three of you, you put in the most effort, would you say?
20     A.   Yes.
21     Q.   Okay. Didn't get paid anything extra for that,
22  did you?
23     A.   No.
24          But the agreement between Steve and I (sic) was
25  that we would split the net amount of the fee at the

1  end. The only way that was ever varied was that when
2  the money came in, we agreed that the people that we
3  owed money to that worked on the case would all be paid
4  without trying to go through a lot of scrambling
5  arithmetic on who paid this expert or who paid that
6  expert or whatever.
7       So, everybody that was unpaid then, which went
8  from the forensic pathologist to Mr. Holme, everyone who
9  was paid got paid off the top, so to speak, before we
10 got to the net amount that was split.
11    Q.   How much did you pay Mr. Holme?
12    A.   For this case, I believe it was $200,000, but
13 Mr. Holme had worked with me for years, so I paid him
14 additional amounts that really were reflection of all
15 the things he had done for me over the years.
16    Q.   This is the videographer?
17    A.   Yes, he was more--
18    Q.   How much total did he get out of this?
19         THE COURT: Who was this?
20         THE WITNESS: He did the video, but he did more
21 than that. Vic was--
22         BY MR. SHER:
23    Q.   What I want to know from you, and the question
24 is--and I would appreciate it if you would answer it--is
25 how much did you pay him total out of the whole thing?

104

1   the thing finished and file it.

2       Q.   Now, at that point when you did that, you were
3   aware that she had some difficulties with Mr. Perles in
4   terms of getting her agreement in writing, or an
5   agreement in writing?

6       A.   No less than I said before.  She had given
7   Steve something in writing, and Steve said, I didn't
8   agree to this, and there was no further conversation.

9       Q.   No further conversation ever about it as far as
10  you know?

11      A.   As far as I know.  I never asked Steve about
12  it.  I never asked Anne Marie about it further.

13      Q.   The $500,000 amount that you talked about in
14  terms of contributing, that was just something that you
15  were--would have been willing as a contribution.  It
16  wasn't like her entire fee, was it, from your
17  perspective?

18      A.   Well, I felt that it would be fair for me to
19  throw something in because Steve had insisted on paying
20  half of the amount we were paying Vic Holm, who would
21  primarily work for me.  So, it seemed to me that
22  would--that would be fair.  I had no legal obligation.
23  I could have--

24      Q.   But you would have expected Steve to add
25  something to that, I take it.  You weren't trying to

1  take the slack there?

2   A.   It was the question of I will put money in to
3  match something with Steve.

4        I remember what I said exactly to Anne Marie on
5  that subject, and that was that having practiced law for
6  a lot of years, there weren't very many opportunities
7  one gets over a career to be paid amounts of money like
8  this, and I wanted to see her make out as well as
9  possible.

10  Q.   Okay.  Then let me end your examination here
11  just with one question.  No doubt about the quality of
12  her work was very good?

13  A.   She wrote very well.  Say that only based upon
14  what I got that was obviously written by her and by
15  Steve, and at one point she brought in--I don't know
16  whether it ended up as a published article or whether as
17  a proposed article that had only her name on it, and she
18  said she had written it, and I rather assumed she did,
19  that she always told me the truth, I thought, and I
20  thought it was very nicely written.  It flowed well, and
21  it was informative without being too wordy, and I
22  thought she did nice work.

23  Q.   And you have no interest in the outcome of this
24  case, I take it?

25  A.   No interest in the outcome?

1    A.   No.  It was disposed of on motions practice.

2    Q.   Did you have any assistance or associates or
3    law clerks working with you on Princz?

4    A.   Yes, Ms. Kagy worked on the case with us.

5    Q.   How did you go about finding Ms. Kagy, or how
6    did Ms. Kagy come to be working with you or for you on
7    the Princz case?

8    A.   I had had a number of clerks from George Mason
9    University Law School and made inquiry at the law school
10   looking for a clerk who might be interested in working
11   on that case.

12   Q.   Was there payment involved?

13   A.   Ms. Kagy worked on that case for university
14   credit.  I had--George Mason has a program where
15   students may work on cases for university credit under
16   which they are not allowed to be paid.  I have had
17   clerks from George Mason who worked under both--within
18   and without the program.  That is, some were paid for
19   the work they did, and some chose to take university
20   credit.  Ms. Kagy chose to take university credit.

21   Q.   Do you recall what year that was?  Do you
22   recall what year in law school she was?

23   A.   She was a first-year law student, I believe,
24   when she started.

25   Q.   Did you then employ Ms. Kagy to do any other

```
 1  sorts of work other than Princz?
 2      A.   Yes.  She worked for me on a variety of cases.
 3      Q.   Paying cases?
 4      A.   Yes.
 5      Q.   Did you pay her for her work in paying cases?
 6      A.   Yes.
 7      Q.   Do you recall how much you paid her?
 8      A.   Depending on the nature of the work that she
 9  was engaged in and how mature her legal career was,
10  because after all she started when she was a first-year
11  law student, I believe the lowest rate she was paid was
12  $15 an hour.  By the time she left within her areas of
13  field, if you want to call it that, she was paid $50 an
14  hour.
15      Q.   Was that as a lawyer or law clerk?
16      A.   As a lawyer.
17      Q.   What sorts of cases did Ms. Kagy handle for you
18  while she was still a law student?
19      A.   She handled some domestic cases and some
20  Foreign Sovereign Immunities Act cases.
21      Q.   Did she work--what kind of hours--
22      A.   Did you say while she was a law student?
23      Q.   Yes.  In law school.
24      A.   I'm sorry.  The nature changed so little from
25  when she was a law student to what she did afterwards, I
```

1 A. I would say Tom Fay was.

2 Q. Now, in--at the time that the Flatow complaint 3 was filed, which again is the end of February 1997, did 4 you have an understanding with Ms. Kagy as to how she 5 was to be paid for the work that she would do in Flatow?

6 A. Yes.

7 Q. What was the understanding?

8 A. As I say, Ms. Kagy came to me just before her 9 graduation from the LL.M. program, asking me to be a 10 reference for her and looking for work that I could give 11 her while she was in the business of obtaining a job 12 with a major law firm.

13  I told her the work I had was the Flatow 14 action, and we discussed the anticipated duration of 15 that case, and I think we both agreed that the case 16 would run seven to nine years in duration. You know, we 17 look at the Flatow case in retrospect, and we look at, 18 for example, the Anderson which His Honor tried, I 19 believe, and these are default judgments. So, they go 20 quite quickly, even though have you this special burden 21 of proof.

22  But prior to Flatow, the Iranians had never 23 defaulted in a legal proceeding in the United States. 24 That was something that was entirely unanticipated. In 25 fact, the--prior to Flatow, the Iranians had always

155

1  defended these sorts of actions the way the Libyans
2  continue to defend them, as the Libyans are now
3  defending Pan Am 103 in the action that's going on in
4  New York.
5         And we anticipated a seven- to nine-year
6  activity, and I asked her quite pointedly whether she
7  was willing to make a seven- to nine-year commitment,
8  because that answer was going to affect the structure of
9  any relationship that I would have with any lawyer on
10 that case. The same kind of inquiry of Tom Fay.
11        In her case the answer was no, she couldn't. I
12 mean, she was going to leave for a major law firm as
13 soon as she could basically on no notice, and I
14 understood that, and that was perfectly acceptable. She
15 had to get on with her career. In Tom's case, he said
16 yes. And, in fact, I suggested to him that we not
17 divide this evenly. I think we suggested that we divide
18 it one-third two-thirds, and he said no, I'm going to be
19 with you for the duration of the case
20 shoulder-to-shoulder, I will be an equal partner with
21 you. I will carry my full weight. You don't have to
22 worry about my work ethic. And I said okay.
23        And the discussion I had with Tom--I mean, Tom
24 and I over the years had those kind of discussions that
25 take about two minutes and we get to work and do a case.

156

1           With respect to Ms. Kagy, she was unwilling to
2    make that commitment, and I explained to her this was a
3    contingent case, that I could not--I was a sole
4    practitioner, I could not afford to pay her and put her
5    on in this case, but if she wanted to keep track of her
6    hours, I would pay her at an elevated rate when and if
7    we ever saw any return from the case.
8           She told me that the most important thing for
9    her was she wanted the fee, whatever it was, to be
10   portable.  That was her word.  She wanted portable.  She
11   wanted to know that if she invested some time in the
12   case, then she left because she was not planning on
13   staying, she went to another law firm, it would be
14   portable, and if we got any money it could accrue to her
15   benefit at a another law firm.  And I told her as far as
16   I was concerned, the fee would be portable, I would be
17   pleased to protect her interest, and I understood she
18   was not giving us a long-term commitment.
19      Q.  Do you know whether, in fact, Anne Marie Kagy
20   began to keep track of her hours at that point?
21      A.  I did not know the answer to that question.
22      Q.  Did you ever ask her?
23      A.  No, I did not.
24      Q.  Why not?
25      A.  I never did in any of our cases.  If she was